## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

     **v.**                      **Case No. 16-20020-01-JAR**

**JOSE JUVENAL JIMENEZ-DELATORRE,**

     **Defendant.**

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Jose Juvenal Jimenez-Delatorre's Motion to Suppress Fruits of Illegal Detention and Interrogation (Doc. 12).  The Court held a hearing on Defendant's motion on August 9, 2016, at which time the parties presented evidence and oral argument.  The Court granted the parties leave to submit supplemental briefs following the hearing.  Defendant submitted a supplemental brief on August 23 (Doc. 18), and the Government followed with a responsive brief on September 5 (Doc. 19).  The matter is now fully briefed and the Court is prepared to rule.  For the reasons stated below, the Court denies Defendant's motion to suppress.

**I.      Facts**

Based on the testimony and other evidence submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence.  On February 20, 2016, Defendant was a passenger in a car driven by his niece in Lenexa, Kansas.  Officer Lane Laffey, with the Lenexa Police Department, saw the car make a wide right turn in violation of Lenexa City Code.  Officer Laffey initiated a traffic stop and relayed the license plate tag information to the dispatcher.  The dispatcher responded that the license tag belonged to a person from Houston, Texas.  Officer Laffey observed that the license plate was indeed a Texas plate.

1

At approximately 11:37 a.m., Officer Laffey approached the driver's side of the car, and another officer approached the passenger side.  Officer Laffey explained the reason for the stop and asked the driver for her driver's license and proof of insurance.  The driver produced a Kansas identification card, but did not have a driver's license.  The driver explained that she had not been driving long.  The driver and Defendant also looked for proof of insurance, but found none.  The driver's failure to produce a driver's license and proof of insurance constituted additional violations of Kansas law.  The officer who approached the passenger side of the car asked Defendant if he could see his identification.  Defendant responded that he had none.  The officer then asked Defendant for his name and date of birth, which Defendant voluntarily provided.[1]  During this exchange, the officers could see certain tattoos on Defendant's neck and arms.[2]

Officer Laffey and his partner returned to the patrol vehicle and ran the information that they obtained from both the driver and Defendant through dispatch.  This information included the name and date of birth that Defendant provided.  The dispatcher ran this information through REGIS, a regional database, and NCIC, a national database.  These databases maintain information regarding warrants, criminal history, gang activity, and other information pertinent to criminal investigations.  Officer Laffey testified that the process of running information through dispatch usually takes approximately five minutes per person unless dispatch is busy.  At approximately 11:46 a.m., dispatch responded that it had a possible match in the NCIC database with the name and date of birth that Defendant provided.  Dispatch stated that the passenger, "Jose," was "J-30 out of Texas" based on his name and date of birth, meaning that he had been involved in gang activity in Texas.  After confirming that the officers were physically removed

---

[1]As Officer Laffey testified, a passenger of a vehicle is under no obligation to identify themselves.

[2]These tattoos are also visible on the video that was played at the August 9 hearing.  Gov. Ex. 1.

from the car occupants, dispatch stated that the passenger was an aggravated felon and previously deported. The officers also viewed this information on an in-vehicle computer.

Officer Laffey's partner asked the dispatcher for information on a neck tattoo for the identified person. The dispatcher initially responded "negative," but then explained that the person did have a neck tattoo. However, there was no additional information about this tattoo. The dispatcher then described the following tattoos that were on the identified person:

Right forearm: "Lady Guadalupe"

Left forearm: "Jose"

Right leg: "P"

Left leg: "L"

After receiving this information, between 11:47 a.m. and 11:53 a.m., the officers remained in their patrol vehicle because they were waiting on the dispatcher to provide them with a photograph of the person identified in the NCIC database. At 11:53, the dispatcher asked the officers if they had identified the tattoos on Defendant. The officers responded that they were waiting on the photo from dispatch to positively identify Defendant. After this exchange, Officer Laffey and his partner decided to get Defendant out of the vehicle to look at his tattoos. The officers approached the passenger side of the car and asked Defendant to step out. Defendant obliged and stepped out of the car. The officers asked if they could pat Defendant down, and Defendant responded that they could. The officers also asked Plaintiff to put his hands on his head during the pat down, but did not handcuff him. Officer Laffey proceeded to pat down Defendant. During the pat down, Officer Laffey lifted up Defendant's pant leg and identified the two tattoos on Defendant's legs. Officer Laffey did not ask Defendant before lifting up his pant leg. The officers identified tattoos on both of Defendant's arms, including a

3

tattoo of a female, but did not identify whether these were the particular tattoos that the

dispatcher described on the person's arms.  Officer Laffey asked Defendant where he got all the

tattoos, and Defendant responded "in jail."  After the pat down, at approximately 11:57 a.m., the

officers placed Defendant under arrest.

After contacting Immigrations and Customs Enforcement ("ICE") to inquire about

Defendant's status, the dispatcher contacted the officers to ask for a phone number at which ICE

could reach them.  An ICE agent then contacted Officer Laffey and asked him to further identify

Defendant by getting his parents' names.  After Officer Laffey relayed that information as well

as the descriptions of Defendant's tattoos, the ICE agent explained that they wanted to pick up

Defendant.  The officers then handcuffed Defendant and took him to the Lenexa Police

Department Detention Center.  At the Detention Center, officers took photos of Defendant's

tattoos and obtained his fingerprints.  Officer Laffey explained that these steps are performed as

part of the normal booking process with every person who is arrested, regardless of the alleged

offense.  The ICE agent then came to the Detention Center and took Defendant into ICE custody.

ICE later obtained additional fingerprints from Defendant, and used the fingerprints to link

Defendant to his A-file.[3]

## II.    Discussion

Defendant moves to suppress the evidence obtained as a result of his arrest, namely his

fingerprints and A-file.[4]  Defendant argues that (1) the length of the detention was unreasonable;

(2) the officers lacked probable cause to arrest him; (3) the arrest was illegal because it was

---

[3]"A-file" is short for an "alien file," which contains information relating to a legal or illegal immigrant. "The file may contain applications for permanent-resident status, documentation to support applications for citizenship, and the like."  *A File*, Black's Law Dictionary (10th ed. 2014).

[4]Defendant also moves to suppress certain statements he made after his arrest, on the basis that officers did not provide him with *Miranda* warnings before interrogating him.  Because the Government will not seek to admit this evidence at trial, Doc. 14 at 8, the Court finds that Defendant's motion is moot as it relates to these statements.

performed by local law enforcement officers, rather than ICE agents; and (4) the seizure of

evidence was not attenuated from the illegal arrest, and therefore the evidence must be

suppressed.

### A.   Length of Detention

The Fourth Amendment protects individuals from "unreasonable searches and seizures."[5]

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the

purpose of the stop is limited and the resulting detention quite brief.'"[6]  "During a traffic stop,

'[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can

become unlawful if it is prolonged beyond the time reasonably required to complete that

mission.'"[7]  But an officer may detain a driver beyond the initial scope of the traffic stop if,

during the stop, the officer develops an objectively reasonable and articulable suspicion that the

driver is engaged in some illegal activity.[8]

Defendant argues that the gap in activity between 11:47 a.m. and 11:53 a.m.[9] constituted

an unreasonable and unjustifiable delay, thereby invalidating the detention.  As Officer Laffey

testified, and as the video presented at the hearing indicates, the officers were waiting for the

dispatcher to provide a photo of Defendant during this gap.  Before asking for a photo, the

officers knew that (1) Defendant's name and date of birth matched that of a person who had been

previously deported and was an aggravated felon; (2) the person identified in the NCIC database

---

[5]U.S. Const. amend IV.

[6]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

[7]*United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

[8]*Davis*, 636 F.3d at 1290 (citing *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004)); *Williams*, 271 F.3d at 1268.

[9] Defendant argues that the gap in activity was between 11:47 a.m. and 11:55 a.m.  However, the video presented at the August 9 hearing indicates that the officers began the process of removing Defendant from his vehicle at 11:53 a.m., and defense counsel acknowledged this fact on cross examination.

had been involved with gang activity in Houston, Texas; (3) the license plate on the stopped car

was registered to someone from Houston, Texas; (4) the person identified in the database had

neck, forearm, and leg tattoos, and the officers had observed neck and forearm tattoos on

Defendant during their initial encounter with the car occupants.  This information was sufficient

to provide the officers with a reasonable and articulable suspicion that Defendant was engaged in

some illegal activity.  Thus, the officers were justified in extending the traffic stop for six

minutes in an attempt to obtain a photograph of the individual identified in the NCIC database.

## B.   Probable Cause

Defendant contends that the officers lacked probable cause to arrest him.  "A warrantless

arrest violates the Fourth Amendment unless it was supported by probable cause."[10]  "Probable

cause to arrest exists only when the facts and circumstances within the officers' knowledge, and

of which they have reasonably trustworthy information, are sufficient in themselves to warrant a

[person] of reasonable caution in the belief that an offense has been or is being committed."[11]

"The probable cause inquiry is a 'commonsense, practical question to be informed by the totality

of the circumstances present in any particular case.'"[12]  Further, probable cause is measured

against an objective standard, and depends on whether "the circumstances, viewed objectively,

justify the [the challenged] action."[13]

Defendant is charged with violations of 8 U.S.C. §§ 1326(a) and (b), the essential

elements of which are: (1) the person is an alien; (2) who has previously been removed from the

---

[10]*A.M. v. Holmes*, -- F.3d --, 2016 WL 3999756, at *9 (10th Cir. July 25, 2016) (quoting *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008)).

[11]*Id.*; *United States v. Aranda-Diaz*, 623 F. App'x 912, 915 (10th Cir. 2015) (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007)).

[12]*Id.* (quoting *United States v. Mathis*, 357 F.3d 1200, 1204 (10th Cir. 2004)).

[13]*Ashcroft v. al-Kidd¸* 563 U.S. 731, 736 (2011) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)); *United States v. Salinas-Calderon*, 728 F.2d 1298, 1300–01 (10th Cir. 1984) (citing *Beck v. Ohio*, 379 U.S. 89, 96 (1964)).

United States; (3) is later found in the United States; and (4) did not have permission to reenter.[14]

Section 1326(b) requires an additional aggravating element, such as the previous removal being

subsequent to a conviction for an aggravated felony.  Before handcuffing Defendant and

announcing that they were arresting him, the officers lifted Defendant's pant leg during the

consensual pat-down search and identified additional tattoos that matched the description

provided by the dispatcher.  Defendant argues that this additional action exceeded the

permissible scope of the pat-down search.  Even assuming that the lifting of Defendant's pant leg

transformed the pat-down search into an arrest,[15] the Court finds that the officers had probable

cause to arrest Defendant at this point in the encounter.

As explained above, before searching Defendant, the officers knew that (1) Defendant's

name and date of birth matched that of a person who had been previously deported and was an

aggravated felon; (2) the person identified in the NCIC database had been involved with gang

activity in Houston, Texas; (3) the license plate on the stopped car was registered to someone

from Houston, Texas; (4) the person identified in the database had neck, forearm, and leg tattoos;

and (5) the officers had observed neck and forearm tattoos on Defendant during their initial

encounter with the car occupants.  The totality of this information would have indicated to an

officer of reasonable caution that Defendant was the person identified in the NCIC database as a

previously removed aggravated felon.  Defendant argues that the officers did not have probable

cause to believe that Defendant was the person identified in the NCIC database without cross-

checking all of the tattoos identified by the dispatcher against Defendant's tattoos.[16]  While this

---

[14]*United States v. Argueta-Mejia*, 615 F. App'x 485, 488 (10th Cir. 2015) (citing 8 U.S.C. § 1326(a)).

[15]*See United States v. Aquino*, 674 F.3d 918, 925–27 (8th Cir. 2012) (holding that officer transformed pat-down search into an arrest when he lifted defendant's pant leg).

[16]Defendant uses a baseball analogy in an attempt to illustrate his point.  He essentially argues that a Major League Baseball player cannot be accurately identified by knowing only that the player is a first baseman for an American League team, if the player's correct batting average is not known.  Defendant contends that one would

information would have undoubtedly been helpful, it was not necessary to give rise to probable cause.  The officers already had several pieces of identifying information that gave rise to probable cause.

Defendant also argues that the officers lacked probable cause because they did not know whether Defendant had received permission from the United States Attorney General to reapply for admission into the United States.  As explained above, the fourth element of a § 1326 offense is that the person did not have permission to reenter.[17]  Section 1326 provides that a defendant does not commit the offense if—before the defendant's reentry into the United States—the Attorney General consents to the defendant's reapplication for admission.[18]  The circuits are divided as to whether probable cause is necessary for each element of a suspected crime, and the Tenth Circuit has not addressed this issue.[19]  Even assuming that the officers needed probable cause on this fourth element, the Court finds that the officers had probable cause to believe that Defendant had not obtained permission to reapply for admission.

At the hearing, Officer Laffey testified that according to the NCIC database, ICE had a warrant for Defendant.  Agent Jones later testified that the warrant that Officer Laffey was referring to was a "NIC number," an entry ICE made into the NCIC database.  Agent Jones testified that a NIC number is the functional equivalent of a warrant number, and it serves to alert law enforcement officers that a person is wanted for a federal immigration offense.  In *United*

need to know the player's correct batting average for an accurate identification.  Defendant suggests that without matching his tattoos to those in the NCIC database, the officers were in the same predicament as the fan trying to identify the player without reference to the player's correct batting average (Doc. 18 at 9).  Defendant's analogy is not well suited to this case.  Even assuming that Defendant is referring only to starting players and excluding designated hitters, the fan would have only narrowed down to 15 players by knowing the position and League that the player belongs to.  Here, the officers knew Defendant's name and date of birth, that he had neck and forearm tattoos, and that he was a passenger in a car belonging to someone from Houston, Texas.  All of this information matched information from the NCIC database.  The officers were in a much better position than the baseball fan.

[17]*See Argueta-Mejia*, 615 F. App'x at 488 (citing 8 U.S.C. § 1326(a)).

[18]8 U.S.C. § 1326(a)(2).

[19]*Argueta-Mejia*, 615 F. App'x at 489–90.

*States v. Argueta-Mieja*, the Tenth Circuit addressed whether a district court committed clear error in finding that officers lacked probable cause to arrest a defendant for an immigration offense under circumstances similar to this case.[20]  The Tenth Circuit found that the district court did not commit clear error in rejecting the government's argument that the officers in that case could infer the absence of permission to reenter based on the fact of a NCIC alert indicating a previous deportation.[21]  The Tenth Circuit explained that the court could have reasonably accepted the government's proposed inference, but that in the absence of any evidence or case law regarding the effect of an NCIC immigration alert, the court did not commit clear error in rejecting the inference.[22]

Here, unlike in *Argueta-Mieja*, the Court has heard evidence regarding the effect of a NIC number alert.  As Agent Jones testified, the NIC number alert served as a notification that Defendant was wanted by ICE.  It was reasonable for the officers to infer that a person who was previously deported as an aggravated felon and wanted by ICE had not obtained consent from the Attorney General to reenter the country.  Defendant contends that it is possible that the NCIC reflected inaccurate information.  But that is not enough to overcome the reasonable inference that a person has not obtained consent to reenter the country when that person is identified as wanted by ICE in the NCIC database.  As the Tenth Circuit has explained, "probable cause does not require metaphysical certitude or proof beyond a reasonable doubt. 'Probable cause is a matter of probabilities and common sense conclusions, not certainties.'"[23]  The officers in this case reached the common sense conclusion that Defendant, who was identified with a NIC

[20]*See id.*

[21]*Id.*

[22]*Id.* at 489 n.7 (explaining that government failed to cite to any case law regarding the effect of an NCIC alert).

[23]*United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (quoting *United States v. Biglow*, 562 F.3d 1272, 1280 (10th Cir. 2009)).

number as a previously deported aggravated felon, had committed a federal immigration offense. The Court finds that the officers had probable cause to arrest Defendant.

### C.       Legality of Arrest

Defendant also argues in his supplemental brief that even if the officers had probable cause, they could not arrest Defendant for a federal immigration offense.  Defendant relies on two cases for the proposition that local law enforcement officers do not have general authority to make arrests for federal immigration offenses.  First, Defendant cites the Supreme Court case *Arizona v. United States*,[24] in which the Court held unconstitutional an Arizona state law that provided  that a state officer "without a warrant, may arrest a person if the officer has probable cause to believe . . . [the person] has committed any public offense that makes [him] removable from the United States."[25]  The Court explained that "as a general rule, it is not a crime for a removable alien to remain present in the United States."[26]  The Court further explained that under 8 U.S.C. § 1357(g), state officers could perform the functions of an immigration officer only in specific circumstances.[27]  By granting state officers the general authority "to decide whether an alien should be detained for being removable," the Court held that the Arizona statute conflicted with the federal removal process.  Defendant argues that *Arizona* abrogates two previous cases, *United States v. Santana-Garcia*[28] and *United States v. Vasquez-Alvarez*,[29] in

---

[24]132 S. Ct. 2492 (2012).

[25]*Id.* at 2505–07 (citing Ariz. Rev. Stat. Ann. § 1303883(A)(5) (West Supp. 2011)).

[26]*Id.* at 2505.

[27]*Id.* at 2506.

[28]264 F.3d 1188, 1193 (10th Cir. 2001).

[29]176 F.3d 1294 (10th Cir. 1999).

which the Tenth Circuit held that state law enforcement officers "have the general authority to

investigate and make arrests for violations of federal immigration laws."[30]

Second, Defendant cites *United States v. Argueta-Mejia*,[31] a District of Colorado case in

which the court suppressed evidence of a § 1326 violation under circumstances similar to this

case.  The officer in that case pulled the defendant over after he observed a traffic violation and

obtained the defendant's driver's license, insurance, and registration.[32]  The officer ran this

information through the NCIC, which returned a "hit" notifying the officer that the defendant

was a previously deported felon.[33]  The database also provided a telephone number for ICE along

with the "hit."[34]  The officer called the phone number and ICE asked the officer to hold the

defendant, so the officer placed the defendant under arrest.[35]  The officer then transported the

defendant to the local police department and turned him over to ICE custody.[36]  ICE obtained the

defendant's fingerprints and results from his A-file.[37]

The district court did not address whether the officer had probable cause to arrest the

defendant, but found that the officer lacked the authority to arrest the defendant for a federal

immigration offense.[38]  The court explained:

> When no federal arrest warrant exists for a particular individual, as in this case,
> federal immigration authorities may arrest that person "only where the alien is
> likely to escape before a warrant can be obtained." *Arizona v. United States,* ——
> U.S. ——, 132 S.Ct. 2492, 2506, 183 L.Ed.2d 351 (2012) (internal quotation

---

[30]*Id.* at 1296.

[31]166 F. Supp. 3d 1216 (D. Colo. 2014).

[32]*Id.* at 1219.

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.* at 1219–20.

[37]*Id.* at 1221.

[38]*Id.* at 1222–26.

omitted).  However, this Defendant was not arrested by a federal immigration agent; Officer Tritschler is a Denver Police Officer.  "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 2506.  Section 1357(g) regulates the "[p]erformance of immigration officer functions by State officers and employees." The majority of the provisions in § 1357(g) apply only where there is an agreement between the Attorney General and the political subdivision which employs the officer. *See* 8 U.S.C. § 1357(g)(1)–(9). It is undisputed that Denver does not have such an agreement with the Attorney General and, therefore, these provisions do not apply.[39]

The court further found that an exception under § 1357(g)(10), which allows local officers to detain individuals not lawfully present in the United States when the officers are "cooperating" with the Attorney General, did not apply because the court did not credit the officer's testimony that he contacted ICE before arresting the defendant.[40]  Accordingly, the Court granted the motion to dismiss.[41]

Defendant asks the Court to find that the officers here lacked the general authority to arrest Defendant for a federal immigration offense in light of *Arizona* and *Argueta-Mieja*. *Arizona*, however, does not resolve the issue in this case because the statute in *Arizona* addressed the ability of local officers to make arrests for removability, rather than for criminal immigration violations.[42]  Courts have subsequently distinguished between arrests for civil removability, which local officers have no general authority to conduct, and arrests for federal criminal immigration offenses.[43]

---

[39]*Id.* at 1223.

[40]*Id.* at 1223–25.

[41]*Id.* at 1229.

[42]*Arizona v. United States*, 132 S. Ct. 2492, 2505–07 (2012).

[43]*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 1025 n.16 (9th Cir. 2013) (explaining that "the federal government did not occupy the field with respect to arrests for violations of [federal criminal immigration] statutes"); *see Buquer v. City of Indianapolis*, No. 1:11-cv-00708-SEB-MJD, 2013 WL 1332158, at *8–11 (S.D. Ind. Mar. 28, 2013) (finding state statute unconstitutional because statute authorized local officers to arrest individuals who were subject to removal, which is not a crime).

Turning to *Argueta-Mejia*, the Tenth Circuit's ruling on appeal in that case forecloses this

Court from relying on the district court's holding as to the legality of the arrest.  As explained

above,[44] the Tenth Circuit in that case focused almost entirely on whether the officer had

probable cause to arrest.  The court, however, also briefly addressed the legality of the arrest:

> The district court concluded that (1) Officer Tritschler had failed to comply with
> 8 U.S.C. § 1357(g) (2012) and (2) the government had not met its burden to
> demonstrate another lawful reason for the arrest. Appellant's App. at 106–07. In
> challenging the first conclusion, the government contends that Officer Tritschler
> did not need to comply with § 1357(g) because it applies only when state officers
> are performing "immigration officer functions." 8 U.S.C. § 1357(g) (2012).
>
> We agree. The federal constitution allows a state law enforcement officer to make
> an arrest for any crime, including federal immigration offenses. *See United States
> v. Santana–Garcia,* 264 F.3d 1188, 1193–94 (10th Cir.2001) (in the absence of
> contrary state or local laws, state law enforcement officers can make arrests for
> violation of federal immigration laws). As a result, we must decide whether
> probable cause would have been obvious for an arrest on federal charges.[45]

Pursuant to this holding, this Court cannot rely on the findings by the district court in *Argueta-*

*Mieja* regarding the legality of an arrest by a local law enforcement officer for a federal criminal

immigration offense.  The *Arizona* decision and 8 U.S.C. § 1357 dictate that local law

enforcement officers cannot perform "immigration officer functions" or make warrantless arrests

for removability in the absence of statutory authority to do so.  But as the Tenth Circuit made

clear in *Argueta-Mieja*, this does not affect the ability of local law enforcement officers to make

arrests for federal immigration offenses.[46]  Here, the officers were not performing "immigration

officer functions," but were arresting Defendant for a criminal immigration offense.  The officers

had authority to arrest defendant.

---

[44]Part II.B. at 8–9.

[45]*Argueta-Mieja*, 615 F. App'x 485, 488 (10th Cir. 2015).

[46]*See id.* at 488.

### III.     Conclusion

Defendant argues that the officers impermissibly prolonged the traffic stop between

11:47 a.m. and 11:53 a.m.  But the officers had reasonable suspicion that Defendant was

committing a criminal violation based on the information the officers received from the

dispatcher, and thus they were justified in prolonging the stop in an attempt to obtain a

photograph.  Defendant also argues that the officers lacked probable cause to arrest him.

However, at the time the officers arrested Defendant, they knew that Defendant had the same

name and date of birth as someone who was identified in the NCIC database as a previously

deported aggravated felon and wanted by ICE.  The officers knew that Defendant had forearm

and neck tattoos similar to the identified person.  They also knew that Defendant was riding in a

car belonging to a person from Houston, Texas, which provided another indication that

Defendant was the same individual who was identified as "J-30 out of Houston."  Considering

the totality of this information, the Court finds that the officers had probable cause to arrest

Defendant for a federal immigration offense.  Defendant also argues that the local law

enforcement officers lacked the legal authority to make a warrantless arrest for a § 1326

violation.  But the Tenth Circuit has made clear, in the wake of *Arizona v. United States*, that a

state or local law enforcement officer can "make an arrest for any crime, including federal

immigration offenses."[47]  The Court finds that the officers had legal authority to arrest Defendant

for a federal immigration offense. The Court therefore denies Defendant's motion to suppress.[48]

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to

Suppress Fruits of Illegal Detention and Interrogation (Doc. 12) is **denied**.

---

[47]*Id.* at 488 (citing *United States v. Santana-Garcia*, 264 F.3d 1188, 1193–94 (10th Cir. 2001)).

[48]Because the Court finds that the officers had probable cause and legal authority to arrest Defendant, the Court does not reach Defendant's fruit of the poisonous tree argument.

**IT IS SO ORDERED.**

Dated: October 14, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
